Filed 8/18/23  P. v. Blackwell CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>COSTELLO BLACKWELL,<br><br>        Defendant and Appellant. | A162883<br><br><br>(Solano County<br>Super. Ct. No. VCR233205) |

This is an appeal from final judgment after a jury convicted defendant Costello Blackwell of attempted murder and assault with a firearm, and found true multiple firearm use enhancements.  The trial court then found true allegations that defendant had two serious or violent felony priors qualifying as strikes and two serious felony priors before sentencing him to 52 years to life.  This sentence included an upper, nine-year term for the attempted murder, tripled pursuant to the "Three Strikes" law.

On appeal, defendant contends the trial court committed prejudicial cumulative error and violated his constitutional right to a fair trial by (1) admitting detailed evidence relating to an uncharged murder he allegedly committed and (2) excluding evidence relating to the victim's inconsistent statement that someone else shot him.  Defendant further argues, and the People concede, we must remand this matter for further proceedings because

1

(1) ameliorative changes to Penal Code[1] section 1170, subdivision (b) apply retroactively in this case to limit the trial court's discretion to impose the upper term and (2) the trial court erroneously failed to award presentence conduct credits. We agree with the parties this matter must be remanded for further proceedings to permit the trial court to resentence defendant under the amended version of section 1170, subdivision (b) and to recalculate his presentence credits. In all other regards, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 10, 2019, an information[2] was filed charging defendant with attempted murder of Teiquon C. (§§ 664, 187; count 1) and assault with a firearm on Teiquon C. (§ 245, subd. (a)(2); count 2). The information alleged that as to count 1 defendant discharged a firearm causing great bodily harm (§ 12022.53, subd. (d)) and as to count 2 he personally used a firearm in its commission (§ 12022.5). Further, the information alleged defendant had two serious or violent felony priors that qualified as strike offenses (§§ 667, subd. (d), 1170.12, subd. (b)) and two serious felony priors (§ 667, subd. (a)). A jury trial began on February 4, 2020.

## I. *The Prosecution's Case.*

Teiquon C. was released from prison on or about January 8, 2018. Although his parole officer arranged for him to enter residential drug treatment programs, Teiquon C. was kicked out and needed a place to stay. In early 2018, defendant and Teiquon C. were friends, and defendant allowed him to stay in a trailer on his property in Vallejo. Admittedly, Teiquon C.

---

[1] Unless otherwise stated, all statutory citations herein are to the Penal Code.

[2] An amended information was filed on January 30, 2020, to correct defendant's prior conviction dates.

was using quite a bit of methamphetamine at the time. Defendant helped Teiquon C. find a job as a watchman at a moving company, owned by David R., located at 709 Admiral Callaghan Lane in Vallejo. Eventually, Teiquon C. began doing other jobs for the company and staying in a blue trailer on the property. Another man, Charles F., an associate of defendant, lived near the trailer and also watched over the property.

**A.      November 1, 2018:  Teiquon C. Is Shot.**

On November 1, 2018, police officers picked up Teiquon C. near his trailer because he was required to register as a gang member. After his registration, Officer Martinez asked Teiquon C. if he knew why he was being questioned. Teiquon C. responded that it could be related to a witness intimidation case. Officer Martinez then asked Teiquon C. about the February 2018 murder of Daryl Huckaby, for which a man identified as Daniel S. had been arrested. Officer Martinez advised Teiquon C. that Daniel S.'s wife told them Teiquon C. might have information about this murder. Teiquon C. and Daniel S.'s wife were "friends" and had communicated through a social media network. Teiquon C. acknowledged that he was in the vehicle with defendant when defendant shot Huckaby, who was driving a recreational vehicle. Officer Martinez had difficulty understanding Teiquon C.'s explanation of what transpired, so he brought out a map as an aid for the interview. After their meeting, Officer Martinez dropped Teiquon C. off near 709 Admiral Callaghan Lane.

Charles F. was at 709 Admiral Callaghan Lane when officers picked up Teiquon C. on November 1, 2018, and later asked Teiquon C. why they contacted him. Teiquon C. replied the meeting related to his gang registration.

Later that evening, about 9:50 p.m., Teiquon C. entered a gas station at 708 Admiral Callaghan Lane, bleeding profusely from his elbow. Teiquon C. told a man in the store "Costello Blackwell" shot him, and the man called 911. Teiquon C. was taken to a hospital, where hospital records noted an accidental shotgun discharge. X-rays showed Teiquon C. suffered a shotgun wound at close range to his left elbow that required surgery. Teiquon C. also had stippling on his face and abrasions on the middle knuckles of the second through the fifth fingers of his right hand, which he could not explain. Teiquon C. additionally suffered a corneal abrasion to the eye.

Officer Martinez interviewed Teiquon C. at the hospital on the morning of November 2, 2018. Teiquon C. told him that defendant shot him while wearing a wig. After the shooting, defendant wanted Teiquon C. to go with him, telling Teiquon C., "I shouldn't even be letting you live." Teiquon C. responded, "I ain't gonna say nothing." Defendant replied, "[N]o, but you that type of nigga that snitch."

Officer Martinez asked what happened to Teiquon C.'s right hand, as his hand was not injured during their meeting the previous day. Officer Martinez thought Teiquon C.'s hand injury was consistent with having been in a fight, but Teiquon C. told him that a shotgun blast hit him in the hand and that he had been shot four or five times.

At trial, Teiquon C. testified that about 9:40 p.m. on November 1, 2018, he was on the phone in the blue trailer. He heard a noise, and when he stood up, he was shot. Teiquon C. looked up to see defendant, wearing a wig and a beanie, standing in the doorway with a shotgun. Teiquon C. said defendant shot at him two or three times. One shot hit his left arm, and another grazed the back of his right hand before hitting the wall of the trailer. Teiquon C. tried to spin out of the way of the third shot and knocked over a lamp.

4

Defendant mentioned "all that shit you were talking" and warned that Teiquon C. did not want to make him an enemy. Defendant then offered to drive Teiquon C. to the hospital. According to Teiquon C., he followed defendant out of the trailer toward a parked car. However, Teiquon C. then noticed that defendant was reloading his shotgun, so he turned and ran through an opening in the fence to the gas station across the street.

## B.     The Crime Scene.

The officers who responded to the 911 call at the gas station followed a trail of blood across the street to the blue trailer. Blood was found on the stairs leading to the trailer's door, which was open and splintered. A bloody jacket was on the ground at the trailer's entrance. Inside, blood was found on the floor, on the wall, and near the bed. There was a bat on the bed. On the floor was a work receipt with a bloody footprint and the name "Costello" on it.

The officers retrieved an expended shotgun shell case outside the trailer near the door, as well as an expended wad from a shotgun shell that appeared to have blasted through the wall. There was a knife on the ground next to the shotgun shell.[3] DNA analysis of the shotgun casing indicated at least one male contributor. However, both defendant and Teiquon C. were excluded as potential contributors.

## C.     Defendant's Cell Phone Communications.

Data extracted from defendant's cell phone showed that he was in frequent communication with his wife, Teiquon C. and Charles F. on November 1, 2018. For example, defendant repeatedly texted Teiquon C. while Teiquon C. was meeting with police officers. Between 2:22 and 2:25 p.m., defendant texted the following: "Answer your phone." "You acting like a true dope fiend." "Dave told me to buy you some food, dot dot dot. I got

---

[3] The knife was not seized as potential evidence.

5

to take this truck back, so you can just take the money and go get whatever you want dot dot. Dope or food, dot dot. So do you want the cash or not. Question mark."

At 3:23 p.m., defendant again tried to contact Teiquon C., texting him: "How everything is going for you right now and how you are feeling right now, it's all based on one decision that you made. You was doing good at first. Everybody had your back. Everybody's going to look out for you and make sure you was all right. But you decided to make the decision to become a dope fiend again. And not only that, you have become a dope fiend with paranoid schizophrenic ass ways where you think that everybody is out to get you. But N, asterisk asterisk asterisk, to be honest with you, nobody gives a damn. You F, asterisk asterisk asterisk, yourself and you want you to remember that, dot dot dot. You let—don't become your best friend and all the people who give a F, asterisk asterisk asterisk, around you to become your enemy dot dot dot idiot. Exclamation point."

At 3:33 p.m., defendant tried to call Charles F., and then at 3:35 p.m. he texted Charles F.: "Text me if you see this N Teiquon back here, dot dot dot. I am taking the truck. Wifey following me." Finally, at 3:43 p.m., Teiquon C. texted defendant: "I'm back at the [moving company] yard." At 4:09 p.m., defendant texted his boss at the moving company: "I am going to put the N TQ [Teiquon C.] off the yard, dot dot dot. He is an idiot."

An expert testified as to the location of defendant's phone based on its connection to certain cell phone towers at various times. From about 4:30 p.m. to 8:30 p.m., defendant's phone connections reflected that he traveled from his Vallejo home to South San Francisco and back, while in frequent contact with his wife. At 8:35 p.m., defendant's wife texted him: "I pray you make it home safely." He responded a minute later: "I love you."

6

"And I will." At 8:44 p.m., defendant texted Charles F.: "Do me a favor and lock up like you always do. And keep an eyes [*sic*] on that truck out back dot dot dot. If Mike shows up call me dot dot dot. I will be there in a flash dot dot dot. . . . I'm in for the night dot dot dot. Tired dot dot dot." Then, between 9:32 p.m. and 9:53 p.m., the time of Teiquon C.'s shooting, defendant's phone was inactive.

At 9:53 p.m., defendant called his wife, and his phone connected to a cell tower close to the crime scene and the freeway. At 9:55 p.m., defendant called his wife again, and his phone connected to a different cell tower, one closer to his residence, indicating he had traveled in a southerly direction.

At 10:18 p.m., defendant called his wife again. His phone connected to a cell tower site near his residence. However, at 10:33 p.m., when defendant's wife called him, his phone connected to a tower site that covered the moving company yard. Defendant called his wife at 10:57 p.m. and Charles F. at 11:30 p.m., and both times his phone connected to a tower site farther south, near his residence.[4]

Defendant called his wife three more times between 11:50 and 11:56 p.m. He then texted her about midnight to report that he was going to the yard to "see what's up . . . ." About 12:30 a.m., he texted her that "something happened at the yard" and he was going to "see what's up . . . ." At 12:42 a.m., he texted her again, stating: "On my way."

At 3:18 a.m. on November 2, 2018, defendant texted Teiquon C., asking: "Where you at question mark. Charles just told me that the room was all fucked up and bloody dot dot dot. What you do question mark." At 3:19 a.m., defendant texted Teiquon C. again: "Call me dot dot dot. Recall

---

[4] Defendant's stepdaughter testified that defendant left home between 11 p.m. and midnight on November 1, 2018.

7

talk dot dot dot." At 9:34 a.m., defendant texted Teiquon C. yet again: "Call one of us, bro, please." Finally, at 4:10 p.m., defendant texted "Slim," stating: "The dude on meth, dot dot dot dot dot, he was in M.C. with us, dot dot dot, he is missing in action with blood everywhere at the little shack at the yard, where he slept dot dot dot. Police was there last night. But for what though we don't know dot dot dot."

### D.     Defendant's Arrest and Jail Phone Calls.

The police arrested and interviewed defendant on the evening of November 2, 2018. Defendant stated that, on November 1, 2018, he left the yard of the moving company about 4:30 p.m. to drive a truck to San Francisco. He returned to the East Bay about 9:00 or 9:30 p.m., going directly home because he was tired. Defendant was unaware anything unusual occurred until Charles F. called him about 3:00 a.m. to tell him there was blood everywhere. Defendant denied knowing Teiquon C. had been shot until the police told him, insisting that he was looking for Teiquon C. all day.

When arrested, two cell phones were found in defendant's car: One belonged to defendant and the other belonged to Teiquon C. Police also recovered four wigs from defendant's bedroom, which he claimed belonged to his wife. When the police later showed them to Teiquon C., he stated that one of them was the wig defendant wore during the shooting.

On June 20, 2019, defendant called a female friend from jail, stating that he had discussed a one-year deal with his lawyer to settle his case and that his mother was encouraging him to take it. A week later, defendant called this female friend again to report he took the deal. She responded that an unknown woman called her to say, " 'I don't know why you're stuck on this fool. He shot somebody with a shotgun. He's facing fifteen years—you so dumb'." Defendant subsequently told the female friend in the same

conversation, "I mean the—the what I did—what they said I did was true but—and I was facing that but I had—I had to take that deal. If I wouldn't have took that deal I would have been having to go to trial. But that's true. But I wonder who said that though."

At trial, the parties stipulated that there were no negotiations to settle this case. From the start, both sides believed it would be resolved by a jury.

### E.    Evidence Related to the Huckaby Murder.

Teiquon C. testified that defendant introduced him to Daniel S. On February 10, 2018, Daniel S. went to defendant's house and spoke with him for a while. Defendant then told Teiquon C. to go with them. Defendant got a gun, and the three men left together. Defendant and Teiquon C. traveled in a Malibu, and Daniel S. followed in a Jeep. Teiquon C. thought they were going to rob someone but later learned Daniel S. had an issue with a girl. They drove until they came across a recreational vehicle in which the girl was supposedly a passenger. Daniel S. tried to cut off the recreational vehicle, and it struck his Jeep. According to Teiquon C., defendant then aimed and fired his gun at the recreational vehicle's driver. Afterward, defendant appeared happy and boasted that he "still had it . . . ."

At 10:45 p.m. on February 10, 2018, police found a large recreational vehicle crashed into a fence at 2200 Tuolumne Street in Vallejo. Huckaby was inside of this vehicle, slouched over in the front seat. The motor was still running and the headlights were on. There was a possible bullet hole just below the driver's side window, with the bullet shell casing located about 215 feet away.

An autopsy revealed that Huckaby died from a single gunshot wound after a bullet entered below his left shoulder, traveled though his left and right lungs, and came to rest in his right armpit.

9

An expert's DNA analysis of the .380 expended shell casing found at the scene revealed a weak and incomplete profile with at least two contributors. Defendant could not be excluded as one of them and was at least 825 times[5] more likely to be a contributor than another, unknown contributor.

## II. *Defense Case and Teiquon C.'s Impeachment.*

Teiquon C. had an extensive history of criminal activity, substance abuse and mental health issues. Teiquon C. had multiple prior convictions, including for robbery with a gang enhancement and battery on a prisoner. While imprisoned, Teiquon C. spent a significant amount of time in the prison psychiatric unit for, among other things, suicide attempts and reporting hearing demon voices.

In 2017, Teiquon C. was arrested for, but not charged with, dissuading a witness in a case involving the robbery of a man in Vacaville. After four suspects were arrested, the victim did not appear for the preliminary hearing. Teiquon C. was then arrested after an investigating officer saw him and two of the suspects in a gas station surveillance video, confronting the victim. In the video, Teiquon C. was seen speaking to the victim before taking out his phone and photographing him. In a subsequent interview, Teiquon C. first claimed to have been asking the victim for spare change in the surveillance video. However, he later changed his story and said he just wanted to make sure the victim did not get hurt, as the other men in the video wanted to kill him. Teiquon C. attended the preliminary hearing, presumably, the defense investigator testified, to see if the victim would appear.

---

[5] Defendant's brief misidentifies this number as 8,325.

10

Lamont G., an acquaintance of defendant, testified that he went to 709 Admiral Callaghan Lane in November 2018 at defendant's request to clean the trailer. Lamont G. found furniture in disarray and blood everywhere, both of which he cleaned up. He also found a phone underneath a desk and gave it to defendant.

Charles F. worked as a caretaker for David R., the owner of the business at 709 Admiral Callaghan Lane. Teiquon C. was introduced to him as defendant's cousin. Charles F. found Teiquon C. to be strange, aggressive and often intoxicated. On November 1, 2018, Charles F. saw a police car in the parking lot but did not see or talk to any officers or Teiquon C. Later, he noticed the trailer door hanging open and went to check on it. He found a mess, with blood everywhere and stuff thrown about. A bat with bloody fingerprints on the handle was on the bed. He used his phone to record the scene and later shared it with David R. and defendant.

In January 2019, Odell G. was at 709 Admiral Callaghan Lane when he noticed smoke coming from a warehouse. He asked Teiquon C. about it. Teiquon C. told him not to worry about it. While waiting for the fire department to arrive, Odell G. asked Teiquon C. whether he set the fire. Teiquon C. again said not to worry about it, adding, "F[uck] the building." Teiquon C. also told him, "David owes me some money, and he's going to pay. And F everything that's in this building and everything that's got to do with David."

A fire investigator later determined there were two points of origin for the fire, one of which was a pile of combustible materials consisting of clothes and cardboard, that appeared to be the result of a human act.

Teiquon C. testified on cross-examination that he was not sure whether he set fire to the warehouse at 709 Admiral Callaghan Lane in January 2019.

11

He was across the street when the fire department arrived. When asked whether he arranged materials in a pile and set them afire, Teiquon C. replied no and stated, "They were already in a pile." Police questioned Teiquon C. about the arson, but he was not charged.

On February 10, 2019, Teiquon C. smashed a window at a market in Vallejo, entered the market, and stole some merchandise. When police arrived, Teiquon C. told them to shoot him. Instead, officers used a stun gun on him. T.C. said he committed the burglary because he wanted to return to jail.

A defense investigator interviewed Teiquon C. in February 2019 in connection with his sentencing in the burglary case. Teiquon C. told the investigator that he was shot at three times: once in the arm, another time in the back, and the third shot hit a wall. Teiquon C. explained that he was shot for threatening defendant's wife.

A defense DNA expert testified that the DNA found on the shell casing retrieved from the scene of Huckaby's murder was very low-level. The defense expert further testified, based on his analysis, that there was strong evidence defendant was not a contributor to the DNA sample. In rebuttal, the prosecution's expert expressed respect for the defense expert but disagreed with his conclusion that defendant was not a contributor.

## III.   *Verdicts, Sentencing and Appeal.*

On March 5, 2020, defendant waived his right to a jury trial on the alleged priors. The next day, the jury found him guilty as charged and found true the firearm enhancements.

On July 9, 2020, a bench trial was held. The trial court then found true the alleged prior allegations.

On May 17, 2021, the trial court sentenced defendant to a total prison term of 52 years to life. Specifically, defendant received 27 years to life—the upper, nine-year term tripled due to the prior strikes—for the attempted murder count and 25 years to life, to run consecutively, for the great bodily injury enhancement. The court then stayed imposition of sentence on all remaining charges and enhancements and awarded presentence custody credits but not conduct credits. This timely appeal followed.

## DISCUSSION

Defendant contends the trial court prejudicially erred by (1) admitting extensive evidence relating to the uncharged Huckaby murder and (2) excluding evidence that Teiquon C. told a fellow inmate in a prison transit shuttle that someone else shot him. Defendant further contends, and the People concede, this case must be remanded for resentencing because (1) an ameliorative postjudgment change to section 1170 applies retroactively to limit the trial court's discretion to impose the upper term on count 1 and (2) the court erroneously failed to award presentence conduct credits.

## I.     *Admission of Evidence of the Uncharged Murder.*

Defense counsel moved in limine to exclude evidence relating to the Huckaby murder under Evidence Code sections 1101 and 352. The trial court found the objected-to evidence relevant to whether defendant had a motive to shoot Teiquon C. but noted that admitting it should not "turn this trial into a separate trial" on Huckaby's murder. Defense counsel then refined his motion to seek exclusion of any evidence relating to the Huckaby murder that went beyond the fact that Teiquon C. told police that defendant committed another murder. The court denied this motion and admitted the evidence, which included testimony from multiple witnesses, including Teiquon C. and Officer Martinez. Additionally, the court provided limiting instructions that

13

forbade the jury from considering this evidence (1) unless the prosecutor proved by a preponderance of the evidence that defendant murdered Huckaby and (2) for any improper purpose, including bad character.

Defendant contends the trial court's ruling was prejudicial error and violated his constitutional right to due process. Defendant concedes some evidence relating to the uncharged murder was relevant to prove the prosecution's theory that he committed the charged crimes to retaliate against Teiquon C. for telling the police he shot Huckaby. However, defendant insists much of the admitted evidence related to prejudicial details about the murder that went beyond what was necessary to prove motive. For reasons set forth *post*, we conclude the trial court did not abuse its discretion in admitting this evidence under state law or commit constitutional error under federal law.

### A.    Governing Law.

"Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. The provision 'expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' [Citation.] 'Subdivision (b) of section 1101 clarifies . . . this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25.)

14

Thus, " ' "[e]vidence that a defendant committed crimes other than those for which [he or she] is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive . . . . [Citations.] The trial court judge has the discretion [under Evidence Code section 352] to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]" [Citation.] " 'We review for abuse of discretion a trial court's rulings on . . . admission or exclusion of evidence under Evidence Code sections 1101 and 352.' " ' [Citation.]" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1114, 1st, 2d & 4th bracketed insertions added.)

Under the abuse of discretion standard, " ' "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)

**B.    Application of the Law to the Facts.**

Defendant correctly concedes evidence of the Huckaby murder was properly admitted to show his motive for the charged offenses notwithstanding the limits set forth in Evidence Code section 1101, subdivision (a). (*People v. Thompson, supra*, 1 Cal.5th at pp. 1114–1115.)

15

Defendant nonetheless argues the trial court violated Evidence Code section 352 by admitting extensive evidence about the Huckaby murder beyond the evidence that Huckaby was dead and that defendant was accused of killing him. This included evidence related to the crime scene, Huckaby's cause of death, and the fact that defendant was a likely contributor to the DNA found at the scene. This evidence, according to defendant, was not relevant to prove he had a motive to shoot Teiquon C. and was extremely prejudicial in inviting the jury to convict him in this case because he supposedly murdered Huckaby. We disagree.

" ' " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " [Citation.] " ' "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case." ' " [Citation.] The "prejudice" which section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*." ' " ' [Citation.]" (*People v. Chhoun, supra*, 11 Cal.5th at p. 29.)

Here, the evidence relating to the Huckaby crime scene, Huckaby's cause of death and the DNA analysis linking defendant to Huckaby's death was almost entirely technical evidence not likely to unnecessarily inflame the jury by evoking an emotional bias. For example, three investigating officers, a forensic pathologist and a crime scene technician discussed in detail issues such as the positioning of Huckaby's recreational vehicle, the likely trajectory of the shotgun bullet as it struck the recreational vehicle, and the path the bullet traveled as it passed through Huckaby's body.

This testimony was not merely cumulative to evidence that Huckaby was dead and that defendant was accused of killing him. Rather, it corroborated Teiquon C.'s statements to Officer Martinez in which Teiquon C.

16

identified defendant, his former friend, as Huckaby's murderer. Specifically, Teiquon C. described defendant as shooting Huckaby, the driver of a recreational vehicle, through the driver-side window while defendant was driving a separate vehicle in which Teiquon C. was the passenger. The witnesses' testimony regarding the positioning of the recreational vehicle and its driver and the trajectory of the bullet was consistent with Teiquon C.'s statements and, thus, was necessary for the prosecution to meet its burden of proving by a preponderance of the evidence that defendant in fact murdered Huckaby. (See *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1224, fn. 14 ["a jury may consider properly admissible 'other crimes' evidence so long as it finds 'by a preponderance of the evidence' that the defendant committed those other crimes"]; *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1153 ["Courts have also noted that '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not *clear*, the evidence should be excluded.' [Citations.] This is so ' " '[b]ecause this type of evidence can be so damaging' " ' "].) This is particularly so given the evidence, in the form of testimony and text messages, that tended to prove that defendant and Teiquon C. had been friends and that defendant had gone out of his way in the past to help Teiquon C. by, among other things, giving him a place to stay. Without the technical and physical evidence corroborating Teiquon C.'s identification of defendant as a murderer, the key issue of motive would have hinged entirely on credibility. (*People v. Winkler, supra*, at p. 1153 ["The connection between an uncharged act and the charged crime cannot be clear unless there is clarity that the defendant committed the asserted act underlying the uncharged crime"].)

Moreover, the trial court properly instructed the jury to consider the Huckaby murder evidence only in deciding whether defendant had a motive

to shoot Teiquon C. and only if the prosecutor first proved by a preponderance of the evidence that defendant in fact committed the murder.[6] We presume the jury followed these instructions. (*People v. Chhoun, supra*, 11 Cal.5th at p. 30; *People v. Barnett* (1998) 17 Cal.4th 1044, 1119 [no prejudicial error in admitting motive evidence where, inter alia, "the court's instructions minimized any danger that the jury might rely upon [said evidence] for an improper purpose"].)

Further, because the trial court did not abuse its discretion under Evidence Code section 352, defendant's constitutional claims also fail. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.) It is well established that routine application of state evidentiary law does not, without more, implicate a defendant's constitutional rights. (*People v. Thompson, supra*, 1 Cal.5th at p. 1116.) Defendant presents no argument that admission of this evidence amounted to a due process violation distinct from his state law analysis, which is insufficient to prove constitutional error. (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025 ["The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates "fundamental conceptions of justice" ' "].)

Finally, even assuming for the sake of argument some small portion of this evidence[7] should have been excluded, reversal is not required unless but

---

[6] The trial court followed CALCRIM No. 375, which states in pertinent part: "You may consider this [uncharged crime] evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense."

[7] Defendant mentions an autopsy photograph of Huckaby. However, this item does not appear to be in the record on appeal, making it impossible, in any event, for this court to assess its prejudice.

for its admission it is reasonably probable that defendant would have obtained a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under this standard, we consider whether it is reasonably probable that one or more jurors would have concluded the prosecution failed to meet its burden of proving beyond a reasonable doubt that defendant shot Teiquon C. if this case were tried without admission of the evidence about the Huckaby crime scene, his cause of death or the DNA analysis. (*People v. Dryden, supra,* 60 Cal.App.5th at p. 1025.) We conclude not.

First, Teiquon C. identified defendant as the shooter to a stranger offering him aid just moments after the incident, when he was bleeding profusely and in obvious pain. Teiquon C. again identified defendant as the shooter a short time later, at the hospital just before surgery, when Officer Martinez interviewed him. And, he consistently stood by this claim in other police interviews as well as at trial.

Second, even if most of the Huckaby murder evidence were excluded, there would nonetheless remain in the record a wealth of evidence that defendant had a motive to shoot Teiquon C. Briefly, in a meeting with police hours before his shooting, Teiquon C. told Officer Martinez that defendant killed Huckaby. Charles F., a close ally of defendant, saw officers pick Teiquon C. up at the moving company yard prior to this meeting and later asked Teiquon C. why he met with the police. Teiquon C. responded that it related to his gang registration. While there is no evidence Charles F. told defendant about Teiquon C.'s meeting with police, the two men were in regular contact on November 1 and 2, 2018.

There was also a wealth of cell phone evidence that supported Teiquon C.'s claim that defendant shot him and defeated defendant's alibi. An expert testified based on cellular data from defendant's phone that

19

defendant was in the vicinity of 709 Admiral Callaghan Lane when Teiquon C. was shot on November 1, 2018, and then moved away from the area and toward home afterward. Consistent with the cell phone evidence, defendant's stepdaughter testified that defendant was not at home on November 1, 2018, between approximately 11 p.m. and midnight. Yet, defendant told police on November 2, 2018, that he returned home from South San Francisco about 9:30 p.m. the previous day and never returned to the yard. Moreover, while defendant made numerous calls and texts throughout the evening of November 1, 2018, his phone was unusually quiet for about 20 minutes around the time of the shooting.

When the police searched defendant's car and home, they found Teiquon C.'s cell phone as well as several wigs that corroborated Teiquon C.'s claim that defendant was wearing a wig when he shot him.

And lastly, during a phone call from jail with a female friend, defendant responded, "[W]hat they said I did was true," when this friend lamented being told by an unnamed person, " 'I don't know why you're stuck on this fool. He shot somebody with a shotgun.' "

During closing arguments, the prosecutor focused extensively on this evidence of defendant's guilt before turning, finally, to the Huckaby murder. And when he did so, the prosecutor reinforced the court's instructions, explaining the evidence could be considered only for the limited purpose of "deciding whether, one, the defendant was the person who committed the offenses alleged in this case or two, the defendant had a motive to commit the offenses alleged in this case. That is why that incident is pertinent and relevant to this case. [Teiquon C.'s] knowledge of Mr. Blackwell's involvement in that incident."

20

The first part of the prosecutor's statement misstated the law: Evidence Code section 1100, subdivision (a) bars consideration of uncharged crime evidence to conclude that if the defendant committed the prior crime, he likely committed the charged crime. However, the jury was correctly instructed on this law by the trial court prior to deliberations. The jury was also instructed: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." These instructions alleviated any prejudice from the prosecutor's misstatement.

Defendant counters that this was a close case, particularly because Teiquon C., the primary witness to the shooting, had serious credibility issues and that admission of the Huckaby murder evidence unfairly tipped the scale against him. Yet, defendant had ample opportunity, which he took full advantage of, to impugn Teiquon C.'s credibility, through rigorous cross-examination and examination of other witnesses on matters related to his mental health, substance abuse and criminal history. Under these circumstances, considering the record as a whole, including both the evidence and the jury instructions, we conclude there is not a reasonable probability that but for admission of this evidence he would have obtained a more favorable result. (*People v. Chhoun, supra*, 11 Cal.5th at p. 45.)

## II.    *Exclusion of Teiquon C.'s Prior Inconsistent Statement.*

At trial, after Teiquon C. testified that defendant shot him, defense counsel sought to introduce evidence through a witness that Teiquon C. told a fellow inmate in a prison transport shuttle in 2019 that he was shot because he had been "messing with the Mexican Mafia" and robbed "some Pisa." Teiquon C. then allegedly stated that the crazy thing was that police were trying to pin the shooting on defendant.

The court questioned Teiquon C. outside the jury's presence as to whether he previously said he was shot by a gang member or that his shooting was gang-related. Teiquon C. replied, "No." Defense counsel nonetheless made an offer of proof, after which the court excluded the evidence under Evidence Code section 352, reasoning that it "sounds like boasting or speculation at best" and that its admission would "create[] a substantial danger of undue prejudice, confusing the issues and misleading the jury for what little probative value [the evidence] has." The court also reasoned that "without any specific individual as having the motive and opportunity to commit this crime, I don't think the threshold for a third-party culpability has been met as well."

Defendant contends this ruling was an abuse of discretion and a violation of his constitutional right to present a defense.

## A. Applicable Law.

As stated, a trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. (*People v. Foster, supra*, 50 Cal.4th at pp. 1328–1329.) In this instance, defendant sought admission of this evidence as a prior inconsistent statement to impeach Teiquon C. " ' "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]' [Citation.] Regarding constitutional limitations, we have held that ' "not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial,

confusing of the issues, or of marginal relevance." [Citation.]' [Citation.]"
(*People v. Lewis* (2001) 26 Cal.4th 334, 374–375.)

##### B.	Application of the Law to the Facts.

We begin with what should be clear:  A prior statement by the victim of, and sole eyewitness to, the charged offenses that someone other than the defendant committed those offenses is highly probative of key issues relating to the defendant's guilt and the victim's credibility.  (Evid. Code, § 780, subd. (h) ["the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to . . . : [¶] . . . [¶] (h) A statement made by him that is inconsistent with any part of his testimony at the hearing"].)  Nonetheless, the trial court excluded Teiquon C.'s alleged statement to a fellow inmate that a gang member, rather than defendant, shot him, after finding it was "boasting or speculation at best."  This was wrong.  A section 352 analysis does not consider witness credibility.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 610 ["the trial court apparently concluded that the evidence was more prejudicial than probative because Culver was not a credible witness.  However, such doubts, however legitimate, do not constitute 'prejudice' under Evidence Code section 352"]; *People v. Chandler* (1997) 56 Cal.App.4th 703, 711 ["Credibility of the proffered witness is not included under [Evidence Code § 352's admissibility] guidelines"].)  As the California Supreme Court explains:  "Except in the[] rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution."  (*People v. Cudjo, supra,* at p. 608.)  Teiquon C.'s alleged statement was not demonstrably false, and the trial court could have set reasonable limits on the proffered testimony

23

and any rebuttal so that minimal time at trial would have been consumed by it.

Moreover, because the proffered evidence was admissible as a prior inconsistent statement that tended to impeach Teiquon C.'s trial testimony that defendant shot him (see Evid. Code, § 780, subd. (h)), the court was wrong to alternatively exclude it as inadmissible third party culpability evidence. Indeed, even assuming for the sake of argument that third party culpability rules applied, the proffered evidence did not run afoul of them. "Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant. But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime. [Citation.] Evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time. (See Evid. Code, § 352.)" (*People v. Brady* (2010) 50 Cal.4th 547, 558.) Here, defendant's alleged statement—that the "Mexican Mafia" came to where he lived and tried to kill him for "robbing a Pisa"—goes beyond mere evidence of another person's motive or opportunity to commit the crime. Whether or not credible (a question for the jury), Teiquon C.'s alleged statement directly linked a third person (a member of the Mexican mafia) to the actual commission of the November 1, 2018, shooting. Thus, we conclude the trial court twice erred in excluding this evidence.

Nonetheless, we conclude that had Teiquon C.'s prior inconsistent statement been admitted, there is no reasonable probability defendant would have obtained a better result. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

For all the reasons discussed *ante*, there was a wealth of evidence of defendant's guilt, including evidence of his motive for committing his crimes, including cell phone data; Teiquon C.'s excited utterance to a stranger just after being shot that defendant was the shooter; and the timing of Teiquon C.'s meeting with the police, hours before the shooting, during which he identified defendant as Huckaby's murderer. (*Ante*, pp. 3–9.)

At the same time, there was a wealth of evidence before the jury that undermined Teiquon C.'s credibility, including evidence relating to his mental health and substance abuse struggles and his extensive criminal history. There was also evidence Teiquon C. told the defense investigator that defendant shot him for threatening defendant's wife, rather than, as he maintained at trial, in retaliation for telling police he shot Huckaby. And, finally, the court allowed defense counsel to question Teiquon C. regarding an alleged conversation he had with an inmate in a holding cell in Solano County during which Teiquon C. allegedly said he was so high on methamphetamine on the night in question that he did not know who shot him.[8] In light of what was before the jury, the court's exclusion of Teiquon C.'s alleged prior inconsistent statement that someone other than defendant shot him "did not keep the jury from learning facts from which it could assess [Teiquon C.'s] character and credibility." (*People v. Harris* (2005) 37 Cal.4th 310, 339.)

Accordingly, we conclude based on the record as a whole there is slight chance Teiquon C.'s isolated statement that he was shot by a gang member, made to an inmate in a prison transport shuttle, would have swayed the jury in defendant's favor.

---

[8] Teiquon C. denied making this statement.

25

### C.    No Cumulative Error.

Lastly, given our conclusion that the trial court's evidentiary rulings did not constitute prejudicial error, we reject defendant's reliance on the cumulative error doctrine as grounds for reversal.  No trial is perfect, and here, there were few errors, and none were prejudicial.  Accordingly, this claim fails.  (See *People v. Anderson* (2001) 25 Cal.4th 543, 606 [rejecting cumulative error claim where the high court "identified no [constitutional] errors, and, as explained at length above, the record provides no basis for concluding that any trial ruling or event defendant has challenged caused him unfair prejudice"].)

## III.    Ameliorative Changes to Section 1170.

Defendant contends, and the People concede, we must remand for further proceedings to allow the trial court to apply the version of section 1170, subdivision (b) that went into effect postjudgment, on January 1, 2022, and has an ameliorative impact on his sentence.  We agree.

Senate Bill No. 567 (2020–2021 Reg. Sess.) amended our determinate sentencing law in fundamental ways.  (Stats. 2021, ch. 731, § 1.3.)  Relevant here, the bill made the middle term of imprisonment the presumptive term unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2), added by Stats. 2021, ch. 731, § 1.3.)

On the contrary, at the time of defendant's May 17, 2021, sentencing hearing, the trial court had broad discretion to select a lower, middle, or upper term sentence.  (Former § 1170, subd. (b); former Cal. Rules of Court,

26

rules 4.420, 4.421, 4.423.)  Under this broad discretion, the trial court sentenced defendant to 27 years to life on the attempted murder count (§ 664).  While the trial court did not explain its decision, we presume, as did the parties, that the 27-year term represents a tripling of the upper, nine-year term for attempted murder under the Three Strikes law (§§ 667, subd. (e)(2)(A)(i), 1170.12, subd. (c)(2)(A)(i)).[9]

Under well-established law, the amended version of section 1170, subdivision (b) applies retroactively in this case.  *In re Estrada* (1965) 63 Cal.2d 740, 745, held that an "amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final."  (Accord, *People v. Tran* (2022) 13 Cal.5th 1169, 1207; *People v. Esquivel* (2021) 11 Cal.5th 671, 675.)  Here, defendant's judgment is not yet final, as his appeal remains pending and the time for petitioning for writ of certiorari in the United States Supreme Court has not passed.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342 ["For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court"], citing *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)

Accordingly, we remand for further proceedings to permit the trial court to apply the amendatory version of section 1170, subdivision (b)(2) in determining defendant's sentence on count 1.

---

[9] Attempted murder "shall be punished by imprisonment in the state prison for five, seven, or nine years."  (§ 664, subd. (a).)

## IV. *Presentence Conduct Credits.*

Lastly, defendant contends the trial court erred in declining to award him conduct credit for his presentence time served in custody. Again, the People correctly concede this is so.

"In general, a defendant receives what are commonly known as conduct credits toward his term of imprisonment for good behavior and willingness to work during time served prior to commencement of sentence. (§§ 2900.5, 4019; [citation].)" (*People v. Thomas* (1999) 21 Cal.4th 1122, 1125.) Section 2900.5, subdivision (a) provides in relevant part that "[i]n all felony and misdemeanor convictions, . . . when the defendant has been in custody . . . , all days of custody . . . shall be credited upon his or her term of imprisonment . . . ." (See Cal. Code Regs., tit. 15, § 3371.1, subd. (c)(1)(A).) Section 2933.1 creates an exception to this general rule for a defendant, such as ours, convicted of a violent felony within the meaning of the Three Strikes law. Under this provision, the award of presentence conduct credits to a Three Strikes law defendant whose current conviction is for a violent felony listed in section 667.5, subdivision (c) "shall not exceed 15 percent of the actual period of confinement." (§ 2933.1, subds. (a), (c).)

At sentencing, the trial court awarded defendant 926 days of presentence custody credit but no days of presentence conduct credit. The trial court reasoned that section 667, subdivision (c)(5) prohibited presentence conduct credits for Three Strikes law offenders. The trial court was mistaken. "As the Supreme Court explained in *People v. Buckhalter*, '[w]e recently held that restrictions on the rights of Three Strikes prisoners to earn term-shortening credits do not apply to confinement in a local facility prior to sentencing. We emphasized that when limiting the credit rights of offenders sentenced thereunder, the Three Strikes law (§§ 667, subd. (c)(5),

28

1170.12, subd. (a)(5)) expressly refers only to "*post*sentence . . . credits," i.e., those " 'awarded pursuant to [a]rticle 2.5' " [citation], and "does not address *presentence* . . . credits" for Three Strikes defendants.' (*People v. Buckhalter* (2001) 26 Cal.4th 20, 32 [citations].)" (*People v. Jones* (2023) 88 Cal.App.5th 818, 822–823.) Thus, the only restriction on defendant's accumulation of credits is the 15-percent limitation under section 2933.1 because he was convicted of a violent felony within the meaning of section 667.5, subdivision (c).

Accordingly, on remand, defendant is entitled to 139 days of presentence conduct credit, representing 15 percent of the 928 days that he actually served in custody.[10]

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings so that the trial court can apply the amended version of section 1170, subdivision (b), and recalculate defendant's presentence credits. In all other regards, the judgment is affirmed.

---

[10] The People point out that defendant was in presentence custody 928 days rather than 926 days, the number used by the trial court, since he was arrested on November 2, 2018, and sentenced on May 17, 2021.

_____

Jackson, P. J.


WE CONCUR:


_____

Simons, J.


_____

Chou, J.


A162883/*People v. Costello Blackwell*

30